May it please the court, my name is David Tellickson and I represent NOVOZYMES. The court is asked to review for substantial evidence the jury's verdict on a question of fact, namely, the jury's finding that all 17 of the claims of the 723 patent are adequately described by the specification. As the record contains substantial evidence supporting this jury verdict, the district court's grant of JMOL should be reversed and the jury's verdict reinstated. Below there was much testimony about the well-developed art in this alpha amylase enzyme art, which is at issue in the 723 patent. There was much testimony about modifying these alpha amylases to improve their properties at a particular position. A position is the place when you count up the amino acids on the amino acid and it's something that's well known in the arts. And Dr. Davies and Dr. Arnold, two of NOVOZYMES' expert witnesses, provided substantial evidence about this well-developed art. They talked about three-dimensional crystal structures that have been known since 1984 and there were a number of them along the ways. And these three-dimensional crystal structures allowed a person of ordinary skill in the arts to see in the three-dimensional structure exactly where each of these amino acids was on these amino acids. Forming this down kind of quick, there's 33 positions, right? There's 19 amino acid substitutions, but Dr. Arnold testified you could in a week make all those substitutions at those 33 positions for one. So 33 people could do this in one week, right? It would take 33 people. Her testimony was at a position... It'll take a week to do the 19 substitutions. And so 33 people, each taking one of the 33 positions, could do this in a week. Correct. Which is not too difficult in this art, is it? Not in this art. Not from the testimony at trial, Your Honor.  It was more of the lab technician versus these... A person of ordinary skill in the art had a PhD or a master's and a number of years of experience. So it was actually something that a lab tech could do in a fairly routine fashion. Dr. Davies and Dr. Arnold also addressed a point that Denisco had raised about the differences in this... It's called the terminal-like family. It's described in the patent, and it's a closely knit family of these alpha-amylases that are particularly useful in industry. And there was testimony that BSG and BLA, the two big ones in industry, and two of them that are preferred in the patent, they were two of the three that was described in the original claim four, they had virtually identical three-dimensional structures. Dr. Arnold, I believe, said almost, and Dr. Davies said nearly. Dr. Raines, on the other side, tried to paint a picture that they were so different that they would exist in different galaxies of the universe, but that was rebutted by the testimony of Novozyme's experts. And what this similarity or near identity in three-dimensional structure allows, Your would expect that change to have the same effect in another backbone. And so when the patent says you can use one of several backbones, it actually says BSG or Bacillus Stereothermophilus, which ended up in the final claims, was preferred in, I believe, column 21 of the patent. But no matter which of these family members you chose, the testimony was that a change in one would result in a similar result or change in the other backbone. They also talked about the 33 positions. There were 33 positions at which they talked. Let's say that that was the testimony. I mean, is that clear from the original application? Which part? Whether the BSG and BLA are sufficiently similar that you would expect the same functionality given the same change? Your Honor, the entire amino acid sequence for both is set forth in the patent. So a person of skill in the art could compare the sequences. They are not identical. They actually differ in about one of the three amino acids. But the testimony at trial was that a person of ordinary skill in the art, there's a thing called the protein database. So they differ in one of the three? One of three. So one third of the amino acids. And that was a point that Danisco tried to make a big deal about. But the testimony was that nature over the eons may change two amino acids in a way that doesn't matter. So there may be differences, but they're insignificant differences. So a person of ordinary skill in the art could tell that from the sequences. They also had access to these three-dimensional crystals, which Dr. Davies said they could, with a click of the mouse, they could pull up on their browser, which was something that a graduate student would commonly do. And they could see that the structures are identical. I believe it's volume four of the appendix just past the table of contents is the three-dimensional structure that was shown on the screen. Yeah, it's A15680. These are the three-dimensional structures of BLA is at the bottom and BSU is top. And after Dr. Raines said these are so different that they would live in different galaxies, I showed him this picture and he couldn't tell them apart. And that was the testimony from Dr. Davies is they're essentially identical. And that's something a person of ordinary skill in the art would know, the sequences are actually in the patent. But when a person of skill in the art interprets these sequences, they use these crystal structures and look at them on their computer so they can spin them around and see what they look like in 3D. There was also testimony that a person of skill in the art would recognize that 16 of the 33 came from what's called random mutagenesis. There are examples in columns 25 and 26 of the patent where they actually did experiments to show increased thermostability for 16 of the positions. The other 17 came from a process, there's essentially two processes for discovering these positions called rational protein design. And Dr. Davies testified that a person of skill in the art reading the specification and looking at these crystal structures would recognize that that was the method that was used. Karsten Andersen was the inventor of the 17. He appeared at trial and gave extensive testimony on his inventive method and how he came up with the invention. He was particularly intrigued by this Japanese alpha amylase that he read in the publication, the 334 publications, it's in the record. And it could operate without calcium. And he said, well, that's very interesting. I need for these industrial situations, I need something that is both highly thermostable, but also we can't use calcium because there's problems with adding calcium. So he thought if he compared the two, he can learn some things by comparing the Japanese structure with the other structures that they were using. And that's where he came up with these 17 positions was through this process. And it was detailed at trial. And Dr. Arnold testified that finding these positions is really key. She called it the inventive step. She called it something really special. And she had a paper from 1999, which is just a year or two before the date of these priority applications. And it's PX76A15697. And in this publication, she came up with two positions out of a whole bunch. And then when she went and did the 19 substitutions of those two, she called it the sweet spot. She found a whole bunch of good variants of those. And so that was part of her testimony about the significance of what Carson Anderson did and what Nova Zymes did with the other 16 in coming up with these positions and teaching them in detail in the specification as far as the importance of the position. Because the claim says a substitution of position 239, wherein the variant has increased thermostability. And the actual, the other part of Dr. Arnold's testimony was the actual changing out of one of these amino acids is routine. It's simple. She called it standard stuff, straightforward, very simple. So again, a lab technician, once they're pointed to the position, could swap out the amino acid and test it for thermostability. You've attached some significance to the fact that the rational protein design produced site 239, albeit on the different backbone, which is 242, I guess, on the DSP. Right. It's just which ruler you use. If the, hypothetically, if the rational protein design, if the inventor had simply come up with, let's say, four spots, the first four sites, and then had said, well, the rest of the sites can be identified through the exercise of rational protein design, had not come up with 239. Do you think that this case would have to be decided differently? Your Honor, I think there would be written description for those four, but not the rest. Not the rest. If they did not identify 239 and said, well, given what I've taught you, you could figure it out. Even though someone using rational protein design could find 239, let's say, arguably without an enormously inventive contribution. Well, what Carson Anderson did was definitely an invention. Using rational protein design still takes invention. I mean, he had to spot this Japanese alpha amylase and think, oh, that would be interesting. He then needed to compare it with his 3D glasses and do all the things he does to find a trial. But once he had that methodology down, then presumably he could hand off the task of working through the others and coming up with the remaining, what is it, 16 or 17 rational protein designs? Well, there's 17 rational protein designs, 16 in the examples. OK. He could have come up with the other 13 or somebody else could have. I suppose it could be he could have given enough detail. I mean, at trial, he laid out all of his exactly what he did step by step in his process. I suppose you could have enough written description in your patent laying out exactly what he thought to then have written description for more. That would be hypothetical. All right. But. So. Do you want to preserve your time, Mr. Kellogg? I will. Mr. Lipsy. May it please the court. This is a question of fact or law. It is a question of fact, but. We have a jury that made a decision here, right? Indeed, we do. What is the standard that one has to apply to overturn a jury on a factual finding? The relevant facts have to be those. What's the standard? Have to be those on which no reasonable jury. Reasonable jury. No reasonable jury. Now, this judge found that this jury was reasonable on a whole variety of other points, right? It was reasonable on enablement. It was reasonable on infringement. I don't believe. It was reasonable on everything except this, right? I believe that the other JMOL motions were not acted on as moot. So I think this is the only issue that was addressed. And this happens to be an issue that's particularly troublesome for a variety of reasons for juries. And the principal point. If you have a jury, he's got to decide this jury was not even reasonable. And he didn't even bother to go to the other points you came to suggest. The evidence on the relevant facts was beyond dispute and the applicable law is clear so that no reasonable jury could have found that this written description was adequate. We heard a lot of discussion here for the last 15 minutes. Never mentioned the claim. Written description is all about the invention later claimed. The invention later claimed is a very specific combination of a variety of features that have been cherry picked out of a very broad generic disclosure. It requires a specific backbone, the BSG, which is not described as preferred. That disclosure at column 21 does not appear in the priority document, the November 2000 disclosure, which was what the jury was asked to consider. There are a whole variety of backbones. You have to pick a backbone. You have to decide to make a change at one position, 239. You have to decide to make a single change since the patent, the vast majority of the patent is about these multiple substitutions, 2, 3, 4, 5, even more. 288 of them are illustrated in the patent. You have to decide a single substitution at 239 in a BSG backbone, which is not described as preferred. Decide that it's not going to be an alteration or a deletion, which are the other alternatives. They're not just 19. There are actually 20 possibilities at every site. And you have to decide that it's going to increase thermal stability at a particular condition. And that set of conditions is nowhere described in this patent text. And in fact, the patent never says that you get increased thermal stability at 239. And this is somewhat confusing in their brief. It states that stability, this is in the patent, column 16, lines 38 to 43. It says stability may be altered or improved, but it specifically defines those terms as including higher or lower stability. That's all the patent says. It makes no statement that these things are going to have higher stability. And the other undisputed fact is you cannot predict what changes you need to make at any of these positions in order to get increased thermal stability. You presented all these facts to the jury and lost, right? The jury was confused because it was swamped in testimony, working backwards, looking at the newly presented claim a decade later to this very specific combination, which with hindsight was used to pick and choose out of the specification the individual limitations. And that, Ruchig and Fujikawa say, is error in the written description sense. When you've got one of these cases where somebody has a horrifically broad disclosure and is picking and choosing out of it to make... You've got a person of very high skill in this art, don't you? I'm sorry? You've got a person of very high skill in this art, right? Indeed we do, and even they can't predict what the effects are going to be. Most of the discussion that Your Honor had with opposing counsel has to do with the question of enablement. Could somebody, once you know what to do, once you get the later presented claim that says specifically what to do, could you then do it without undue experimentation? That is not the inquiry under the written description requirement. The written description requirement is, did what you wrote back in 2000 fairly convey to the person of ordinary skill in the art that you were in possession of what you now are claiming? What's possession mean? Possession means that you have made a completed invention, a completed conception of the invention. And the jury found that that occurred. A reasonable jury could not have found that occurred because there is not a description in this patent of a single sequence that meets the limitations of the claim. This was a broad spectrum research plan to investigate innumerable changes and innumerable positions in a large number of backbones to see changes up and down in a wide variety of properties under varying conditions. And the reason they say improvement means up or down, the obvious reason is they didn't know. They had made 17 or 15 of these molecules. They were trying to claim hundreds and thousands, if not hundreds of thousands of these, and they just didn't know. They hadn't done the experiment and there was no relationship between structure and determine what those molecules were. They are claiming the molecules. This is just like UCD Lilly. It is just like ARIAD. They are claiming molecules and all they've disclosed is a plan or a method of how to make them. Sure, the art was developed. Sure, the tools were available. Sure, people could do these experiments given enough time. But people, the critical fact, and it's undisputed, they could not know without making and testing what these molecules looked like that would have increased thermal stability without doing it. And that is the classic second prong of written description that we see repeatedly in the decided cases like Boston Scientific where somebody has posited the problem to be solved and outlined the experiment and left for somebody else to do the hard work of actually coming in and determining what works and what doesn't. Is that the work part? The testimony was that the work that D'Anesco did to come up with this took about six months. And the fact of the matter is, when we're talking about written description, the issue is not could you do it. The issue is not one of enablement. Enablement gets to be supplemented by all kinds of things. The issue is did you describe as having invented the thing you're now claiming and they're claiming specific molecules. They are claiming specific molecules that have specific structures. The one proposal they made at 239 is not within the scope of the claim. It does not increase thermal stability. That is undisputed. So they are in the same boat that Ariadne was in and the same boat Rochester was in. They tried to claim a bunch of molecules without ever describing even a single one that meets the limitation of the claim. And this court, reading this court's opinions and seeing those undisputed facts, concluded on several levels that this case failed to meet this court's requirements for written description. It cherry-picked a very broad disclosure. Why did it go to the jury then? It went to the jury because that's what trial judges do, Your Honor. Did you move to prevent it from going to the jury? Indeed. We filed our J-Mal motion. At one point, the judge agreed with the jury and then he changed his mind. Is that what you're saying? No. What happens below, and we fight this battle every day, judges hope the jury gets it right. If the jury gets it right, it's easy. You don't have to write an opinion. They don't have to do anything. Judges let these matters go to the jury. She let this one go to the jury. The jury got it wrong. And she wrote a very well-reasoned opinion pointing out exactly what the undisputed facts are. That's the standard? The jury got it wrong? I thought it was that no possible reasonable jury could ever do this. That's what I meant by got it wrong. And yet you had a jury that did it. It happens. The Abbott case, he was here on denial of the J-M-O-L. You lost the trial and now you want to recover from your loss, right? That's why we have J-M-O-L, Your Honor. Sometimes juries make mistakes. And you can see in the decided cases that this is an issue. But it's not a question of a jury making a mistake. It's a question of no reasonable jury being able to reach this decision. And that's what I meant. Very different proposition. That's what I meant. Sometimes juries reach decisions that no reasonable jury could reach if they understood the applicable law and understood the significance of the relevant undisputed facts. There was a lot of confusing chaff in the record. And in fairness to people who conduct these trials, a lot of expert witnesses get confused about the distinction between enablement and written description. A lot of juries get confused. A lot of evidence comes in. I know Your Honor has a view on this, which I hope we can get around. But it's sometimes hard to separate the notion, well, once I know about it, can I make it? Which is what a lot of this evidence was. It goes to enablement. From would, without knowing what was later claimed, would I see this as having been something that this inventor invented looking at the application alone? It's that second question that the law of written description addresses. And for two reasons, the undisputed facts demand a judgment of invalidity for no written description. You could not predict without making and testing what changes increase thermal stability. No embodiment within the scope of the claim is described in the application. And the application as a whole describes a very broad spectrum research project, making substitutions, additions, insertions in not just one, but multiple places out of any of these 33 positions. If you wanted skill in the art, would limit that to the substitutions, wouldn't they? Absolutely not, Your Honor. That's not what it says. That's not what it says. Okay. Only when you want to come back, when you now know where success lies and you want to pick and choose, then you can do that. The original claim, equally as broad, it had the full diversity of sequence spectrum in it that, and we're talking about the priority application now, that the application did. The only description of this invention that encompasses what's now claimed included multiple substitutions with substitutions, insertions, deletions at one or more of 33 positions in a large number of backbones. While the BLA backbone was described as preferred in this patent and was the subject of all the examples, the native BSG sequence was not. But it was in the original application. It was referenced, correct? It was referenced along with a very large number of other sequences. And in fact, if you look at that claim for the- How many other sequences in the, how many other- I'm sorry? How many other sequences were mentioned in your NOAA patent? I, specific sequences, when you add them up, including these hybrids that they've got listed in there, there's something like 24 there. It's even worse than that because the claim says, that claim for that they look at, it says it's derived from the sequences 8, 6, and 10. And that's a defined term in the spec. When you look at that, it says, which may have one or more substitutions, additions, or deletions. And in fact, the later dependent claim says that it need only be 60% or more. Just a purely detailed question here. The accused device substitutes guarine for serine at 239? I'm sorry? The accused device substitutes guarine for serine at 239? Is that what it is? Glutamine. Glutamine, all right, all right. Q. Okay, glutamine. And the claim 1 of the 723 refers to substitution of serine. I take it that means for serine. Substitution for serine. And it would include the substitution of any other amino acid. So this covers 19 individual molecules, right? Indeed, it does. Restricted down from the much broader type that was originally described. I just wanted to get that clear. All right, thank you. Okay. Now, this basically was an unexecuted research plan that left to others the hard work of actually sifting through and finding out what works and what doesn't, what's an improved thermal stability and what isn't. And again, the question is reading that very broad disclosure without foreknowledge of this very specific claim that's been cobbled together out of it, would a person of ordinary skill in the art recognize that they were in possession of that specific combination? Sure, 239 is there. Sure, you can find BSG. Sure, you can find the pieces. The question is, were they in possession of this specific combination? And Ruchig and Fujikawa and the cases that have followed it for the last 40 years all say that you cannot take one of these blunderbuss disclosures and then, with foreknowledge of what somebody else has done, pare it down to something that you really were not in possession of to begin with. But if, for example, the claim that is now in the 723 had been in the original disclosure and they had simply said, well, here's one that we think will work, which is substitute one of the 19 for serine, you wouldn't argue that that didn't constitute a sufficient written description? Your Honor, I think I would. I would because keep in mind, the question is what's claimed. It's not a question of finding mutants. It's not, this shows up over and over again in Fears and Lillian. There's lots of times you can have a very good method for finding new molecules. And they described a method of finding new molecules. What they could not describe because they hadn't done it was what the structure or common features were of those molecules that differentiated them from others. And the undisputed evidence is you couldn't predict that. You had to make and test. And even with that narrower claim, what you have in microcosm is the Ariad and Lilly problem. You have a research proposal. You have a plan or a method by which you can find it. You have no description of any operative embodiment within the scope of that disclosure. And you have left it to somebody else to try to find what they are. You cannot describe the things that you cannot conceive of. And when you cannot predict what structures are going to meet the limitations of the claim, they cannot have a preconception. Thank you, Your Honor. Thank you. I believe this case is just like a number of this Court's cases where there was a jury finding and there was substantial evidence of metabolite, MARTEC, Union Oil, Abbott versus Syntron. There was substantial evidence that the jury had to make their finding. And Danisco would like to cherry pick that evidence and that evidence was disputed. Dr. Arnold and Dr. Davies had some very different views on things from Dr. Raines. And they said the art was very predictable. They explained exactly why. Dr. Raines said it was unpredictable. Regardless of what view you take of the written description doctrine, we clearly would agree that it covers any new matter. It prohibits the addition of new matter to a vague disclosure. Why isn't that what happened here with the writing of a very specific claim later in the process? Your Honor, there's no matter in this claim. Position 239 was disclosed. Dr. Arnold said it was one of 33 independently significant positions that a person would recognize would lead to increased thermostability. BSG, it was preferred in the July 31st, 2001, which is clearly the priority application. The judge below made an error by focusing the jury on the November 2000 priority where it was still only one of three. It was BSG, BLA, and BAN. Distinguish this case from Eriot in Rochester. Your Honor, in Eriot in Rochester, the invention had not yet been made. In Rochester, they discovered that it would be great if we could find a COX-2, a selective COX-2 inhibitor. And they said, we even have an assay if you happen to find one. But they hadn't found it yet. And here, Karsten Anderson and the other inventors found positions that Dr. Arnold said were important positions that a person of skill in the art would understand are places where they could run this simple dispositive test to separate those that have increased thermostability from those that don't. Aren't you really kind of assuming your conclusion by saying the invention had not been made there and it was made here because the invention was the discovery of the 33 spots? Ergo, you win. That seems to me... Well, the difference here is that in this specification is exactly the success. Here is an alpha amylase. Here is the backbone. Here is the exact detailed amino acid sequence. Here is position 239. Here are the 19. Column two, lines 22 to 26 say, if we don't mention a particular substitution, we mean substitute with one of the 19. And then they give a dispositive test. Take the 19, run this simple test that everyone in the art knows how to run to separate out those that have increased thermostability from those that don't. Whereas in ARIAD and Rochester, you don't know where to start. The compounds have not been described in the specification. The person of ordinary skill in the art is left still looking for them. They know, having read Rochester, that it would be a good thing if they could find them, but they don't know where to find them. Whereas in this patent, they said, here's what they are. These are the ones that have increased thermostability. So the jury had substantial evidence to support its verdict. And we believe that the JMOL should be overturned. Dr. Arnold walked through all the substantial evidence. Final thought for us, Mr. Tillotson? There was substantial evidence, and this jury verdict should be reinstated. Thank you. Thank you very much. That concludes our hearing this morning.